**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Docket No. 24-CR-203 (RBW)** |
| | ) | |
| ALLAN JENNINGS, | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION FOR VARIANCE & SENTENCING MEMORANDUM**

      **COMES NOW**, the Defendant, Allan Jennings, by and through his counsel of record, Bryan H. Hoss, and hereby files this Motion for Variance & Sentencing Memorandum in support of a fair and reasonable sentence in this case. Mr. Jennings' sentencing hearing is currently scheduled for October 4, 2024. Mr. Jennings would show the Court as follows:

      1.     Mr. Jennings pled guilty to Civil Disorder in violation of 18 U.S.C. § 231(a)(3), and Destruction of Government Property in violation of 18 U.S.C. § 1361, a misdemeanor.

      2.     The Presentence Investigation Report ("PSR") states that Mr. Jennings owes $2,825 for restitution which Mr. Jennings has paid in full prior to his sentencing hearing. He has also paid the special assessment of $125 prior to his sentencing hearing.

      3.     The PSR recommends a total base offense level ten (10), criminal history category I with a guideline range of six (6) to twelve (12) months which is within Zone B of the Sentencing Table.[1] *See* PSR, ¶ 111. Zone B may be satisfied by (1) a sentence of imprisonment; (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes

---

[1] The Government has filed an objection to the PSR and the Defendant has filed a Response regarding whether a §2B1.1(b)(16)(A) enhancement applies. The PSR found that it did **NOT** apply.

community confinement or home detention according to the schedule in subsection §5C1.1(e), provided that at least one (1) month is satisfied by imprisonment; or (3) a sentence of probation that includes a condition or combination of conditions that substitutes intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in §5C1.1(e).  *Id.* at ¶ 112.

4.      Mr. Jennings submits that a sentence of probation and/or home detention for 6-12 months, supervised release for one (1) year and community service is a sufficient sentence but not greater than necessary to comply with the factors set out at 18 U.S.C. § 3553(a) and the entire record in this case.

## I.      LAW

Since *United States v. Booker*, the sentencing guidelines are "effectively advisory."  *United States v. Booker,* 543 U.S. 220, 245, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). This Court is not bound by mandatory sentencing guidelines. *Id.*  *Booker* simply requires a sentencing judge to consider the guideline range and then impose a reasonable sentence pursuant to the factors listed in 18 U.S.C. § 3553(a).  *Id.*

Subsequently, in *Gall v United States*, 552 U.S. 38, 47, 50, 128 S. Ct. 586, 169 L.Ed.2d 445 (2007), the Supreme Court held that a sentencing judge must "adequately explain the chosen sentence" but rejected an "appellate rule that requires 'extraordinary circumstances' to justify a sentence outside the Guidelines range."

18 U.S.C. § 3553(a) contains factors for this Court to consider as follows:

> Factors to be considered in imposing a sentence—The court shall impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed shall consider—
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

(3) the kinds of sentences available;

(4) the kinds of sentence and sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines;

(5) any pertinent policy statement;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

(7) the need to provide restitution to any victims of the offense.

## II.  ARGUMENT

### A.  **Motion for Variance.**

Mr. Jennings moves this Court to grant a downward variance from the Sentencing Guidelines.  Such a sentence is sufficient, but not greater than necessary to satisfy the relevant factors identified in 18 U.S.C. § 3553(a).  Mr. Jennings asks this Court to take the following into consideration:

- Mr. Jennings's lifetime as a law-abiding citizen (57 years).

- Mr. Jennings has no criminal history points (0) and has never been arrested.

- Mr. Jennings served in the U.S. Army and was honorably discharged.

- Mr. Jennings obtained his nursing degree and has been a licensed nurse in California and Tennessee since 1993 (over 30 years).

- Throughout his career, Mr. Jennings has been recognized multiple times by the State of California for his work as a nurse to bring safe, affordable, and better healthcare to their inmate population.

- Mr. Jennings role in the events of January 6, 2021 had nothing to do with leading, organizing or planning what occurred.

- Mr. Jennings attended the rally with his wife.

- Mr. Jennings never entered the U.S. Capitol as others around him were attempting to gain entry.

- Mr. Jennings did not assault any officer.  And as the crowd pushed into the police line, Mr. Jennings was telling the crowd to not hurt police officers.

- At all times, Mr. Jennings was unarmed.

- Mr. Jennings' conduct of breaking the glass door happened very quickly and he soon attempted to leave the area of the Tunnel.

- Mr. Jennings cooperated fully with law enforcement and gave a full and truthful statement to them as well as provided any evidence they requested in his possession.

- Mr. Jennings has significant support of his family, friends and law enforcement in the community in which he lives, Coffee County, Tennessee.

- Mr. Jennings is likely to lose his nursing license which he has maintained for over 30 years as a result of these convictions.

- Mr. Jennings has a history of helping others within his community.

- Mr. Jennings has had good conduct while on supervised release and followed all rules and requirements.

- The risk of Mr. Jennings re-offending is very low, if not zero.

- Mr. Jennings is truly remorseful for his conduct.

- Post-January 6, Mr. Jennings never boasted or bragged about his conduct.

- The Defendant's conduct is aberrant behavior under U.S.S.G. § 5K2.20 in that it was committed without significant planning, was of limited duration and represents a marked deviation by the defendant from an otherwise law-abiding life.

- Mr. Jennings has demonstrated that he can and will serve others.

**B.     The nature and circumstances of the offense.**

Mr. Jennings adopts the factual background described in the plea agreement and the PSR.

On January 5, 2021, Mr. Jennings traveled with his wife to Washington D.C. to attend Trump's election events including the Trump "Stop the Steal" rally on January 6, 2021.

Mr. Jennings heard President Trump's statements and charge to the crowd that the crowd could stop Joe Biden from becoming President while criticizing the actions of Congress and the Vice President.  Admittedly, at the time, Trump's statements to his supporters at the rally had the designed effect of making Mr. Jennings angry at the election process.  Today, Mr. Jennings fully knows and understands that legally, the election process and result could not be changed. However, at the time and in the moment, Mr. Jennings became angry and upset and believed that Trump had been treated unfairly.  And the President's words only threw fuel on that fire.

After the rally, Jennings and his wife walked down to the U.S. Capitol grounds.  Jennings procession to the Capitol was orderly.  He was not yelling.  He was not confrontational to others or to law enforcement.  Photographs show him walking next to his wife.  He was wearing a red Trump hat, dark jacket, sweatshirt and glasses.  He also carried a backpack which contained a pair of medical scissors because he is a licensed nurse.  The scissors had a glass breaking tool on one end.  When asked why he brought a pair of medical scissors with a glass breaking tool to the rally, Jennigs advises the he typically brings a first aid kit with him to public events because he is a nurse.

Jennings, who never actually entered the Capitol building, approached the Capitol's West Plaza where a large crowd had gathered.  Surveillance video and images show Jennings walking around the Capitol grounds taking photographs with his phone.  He does not assault, challenge or

confront any law enforcement officer.  He does not step over or cross any police barrier or barricade.

According to law enforcement and the parties' factual basis in their plea agreement, around 2:40 p.m., the crowd in the West Plaza grew "violent" and started to attack U.S. Capitol police. Jennings does not dispute this fact, but he did not witness any assault on any police officer or anyone pushing through or over police barricades.   And there is no allegation that Jennings turned violent or committed any act attacking the police at this time in the West Plaza.

Per the factual basis in the plea agreement, just one (1) minute later, at 2:41p.m., Jennings walked to and entered the area known as the Tunnel from the Lower West Terrace.  Surveillance photos show two (2) or three (3) other individuals at or around the Tunnel entrance at this time. Those photos also show several water bottles and trash just inside the Tunnel entrance which indicate that other protesters had been in the Tunnell entrance area prior to Jennings.

Jennings stepped into the Tunnel entrance and moved forward approximately 10-15 feet to a set of double glass doors which police had closed and locked.  A photograph of Jennings by these doors shows him standing there looking inside.  There are approximately six (6) other individuals in his proximity.  Video shows law enforcement assembled behind a second set of closed opaque glass doors.  There is approximately 4-6 feet of space between the set of doors where Jennings and others were standing and the second set of glass opaque doors where law enforcement was located. No one was standing between the two (2) sets of double doors, initially.

More crowd members entered the Tunnel behind Jennings.  One (1) minute later, at 2:42p.m., according to the plea agreement, Mr. Jennings pulled out his pair of scissors and used the glass breaking end to strike the glass on one of the doors.  Video shows Jennings standing on one side of the doors.  He strikes the glass twice in the top corner of the door which breaks the

glass.  Video shows another member of the crowd pushing a pole through the hole caused by Jennings making the hole larger.  The damage to the door cost $825 which Mr. Jennings has paid in full.  The glass that breaks from the door appears, on video, to land on the floor, as no one was standing in that area at the time the glass was broken.

After breaking the glass, the crowd eventually opens the doors and begins to push forward to the second set of opaque glass doors.  Eventually, the crowd begins pushing the police line. Jennings is initially up towards the front of the line, but as more and more people enter the Tunnel, Jennings is seen on video attempting to move backwards through the pushing crowd and at 2:47p.m., per the factual basis, he exits the Tunnel and returns to the Lower West Terrace.

After January 6, 2021, Jennings sends a message to a friend in a Facebook message that he was instructing other supporters to "not hurt the police."

Mr. Jennings never enters the Capitol and does not assault any law enforcement officer.

**B.      <u>History and Characteristics of the Defendant.</u>**

 Allan Jennings is currently 57 years old (DOB:  2/11/67).  He has zero (0) criminal history points, has lived a law-abiding life with his wife of thirty-two (32) years, served this Country as a member of the U.S. military and helped others for over thirty (30) years as a licensed registered nurse.

On October 2, 2024, Mr. Jennings celebrated his thirty-second (32nd) wedding anniversary to his wife, Stacey Jennings.  According to Mrs. Jennings, Mr. Jennings is a "loyal, loving and a good man who is always willing to help someone."  *See* PSR, ¶ 79.  The Defendant has two (2) children, Brody (age 30) and Deborah (age 35).  The Defendant had his daughter. Deborah, while he was in the Army and was stationed in Germany.  When his daughter was only 14 months old, he took custody of her.  Both he and his wife, Stacey, raised Deborah.  *See* PSR, ¶ 78.  Mr. Jennings

has two (2) grand-children (Boston, age 16 and Dexter, age 12) whom he is close to and loves very much.

Mr. Jennings was born in Germany while his Father was stationed in the Army. When he was two (2) years old, he moved to California and resided in California until on or about March 2017 when he relocated his family to Hillsboro, Tennessee.

In 1985, Mr. Jennings enlisted in the United States Army. He was honorably discharged in 1988. He was an Army infantryman and according to his DD214, he received numerous decorations, medals and badges in his career including the Army Service Ribbon, Overseas Service Ribbon, Army Achievement Medal, NCO Professional Development Ribbon, Army Good Conduct Medal, and two (2) sharpshooter badges.

In 1989, Mr. Jennings enrolled at San Joaquin Delta College and in 1992, he earned an Associate's degree in Nursing. He soon obtained his Registered Nursing license from the State of California and has maintained his nursing license even after moving to Tennessee in 2017. He is currently licensed as a registered nurse in the State of Tennessee.

From 1994-2004, Mr. Jennings was employed at Deuel Vocational Institution as a licensed registered nurse. During that time, he supervised, trained and evaluated nursing staff which included approximately fifty (50) RN's (registered nurse) and LVN's (licensed vocational nurse). He was voted Supervisor of the Year in 2003.

From 2004-2009, Mr. Jennings worked as the Director of Nurses for the California State Prison system (also known as the California Department of Corrections, hereinafter referred to as "CDOC") where he supervised, trained and directed approximately one hundred-ninety (190) nurses who ensured the health and welfare of thousands of inmates. During his first year in 2004, he received the Unit Citation at the Medal of Valor ceremony. During his time, he oversaw and

8

directed several programs including various inpatient and outpatient housing units, as well as psychiatric and mental health units. He formulated administrative budgets, reviewed and updated nursing operation plans, wrote staff job descriptions, collaborated with the Pharmacist and Chief Medical Officer on controlled substance discrepancies, and acted as the liaison between nursing staff and inmates. He also restructured staffing schedules which resulted in $1.6 million in annual savings to the CDOC. In or around 2008, he initiated an audit of the controlled substance medication usage and discovered medical waste totaling $800,000 and subsequently, developed processes within the CDOC to curb future medical waste.

Between 2009-2011, Mr. Jennings was the Chief Nurse Executive for the California State Prison system where he evaluated and supervised nearly three hundred (300) nurses. As part of the executive team, Mr. Jennings made substantial improvements to patient care, cut costs and provided quality service to inmates.

From 2011 to 2012, Mr. Jennings was the Assistant Statewide Quality Officer for the CDOC and drafted policy for root cause analysis, worked on the steering committee for electronic health records and a patient/scheduling and tracking program, and coordinated proven best practice protocols between physicians and staff.

From 2012 to 2014, Mr. Jennings was the Chief Nurse Executive for the California Health Care Facility (within the CDOC) in Stockton, California. He hired and supervised four hundred-fifty (450) nurses and was part of the executive health care team tasked to provide quality health care to the CDOC's sickest patients.

From 2014 to 2016, Mr. Jennings was the Chief Nurse Executive at San Quentin State Prison and successfully led nursing services while at San Quentin through the accreditation process for both the Joint Commission Behavioral Health and the American Correctional Association. He

actively supervised the Director of Nursing as well as SRN's (state registered nurse), RN's (registered nurse), LVN's (licensed vocational nurse), PT's (physical therapist) and CNA's (certified nursing assistant). In 2016, he received the Unit Citation (his 2nd) at the Medal of Valor ceremony as well as the award for Health Care Professional of the Year.

From 2016 to 2017, Mr. Jennings was employed as a nurse consultant for the Office of the Inspector General and worked closely with physicians and deputy inspectors to monitor and provide oversight to the CDOC's health care facilities to ensure that those incarcerated would receive constitutionally adequate medical care.

After moving to Tennessee in 2017, Mr. Jennings could not stand being retired. So from 2018 to 2022, he worked as a health care administrator for Quality Correctional Health Care with the Coffee County, Tennessee Sheriff's Department. He was responsible for the day-to-day oversight of inmate's care, and supervised, trained and directed a staff of seven (7) licensed practical nurses. As the letters indicate below, Mr. Jennings is well-respected by law enforcement in Coffee County, Tennessee and three (3) of his supervisors including the Sheriff of Coffee County, Tennessee have written letters in support of Mr. Jennings. Upon these charges being filed against him, Mr. Jennings voluntarily resigned from his position.

Presently, Mr. Jennings volunteers for the American Red Cross in multiple positions and responds to disasters in or around Tennessee on their Disaster Cycle Services Team. He has volunteered 576 hours for their on-call services and worked another 106 hours in the field. He also volunteers for Compassus Hospice with his wife and they routinely visit hospice patients.

**C.    Need for the Sentence Imposed to Reflect the Seriousness of the Offense & Promote Respect for the Law**

Mr. Jennings is truly remorseful for his conduct. His decisions to go into the Tunnel, to approach the glass doors, and then to break it occurred over a relatively short period of time. The

plea agreement describes this conduct occurring in just minutes.  Mr. Jennings' conduct was not planned.   And while what Mr. Jenning did was conscious and intentional, his decisions to violate the law happened in an emotionally charged environment in a matter of minutes.  There is no evidence that Mr. Jennings exhibited any sustained intent to violate the law.

While President Trump's words angered him on that day, he stands before this Court knowing that he did not go to Washington D.C. in order to get into a fight or to hurt anyone.  He wishes that the January 6, 2021 riot did not happen and he is not proud of his conduct of breaking the glass door.  That was a conscious decision of his that was made in a relative instant and carries with it a lifetime of consequences including a permanent felony conviction, the likely loss of his nursing license of 30+ years, restitution, probationary and supervised release rules, the loss of his civil rights such as to vote, and the public humiliation[2] of this case.

As the character letters below show, Mr. Jennings has respect for the law and for law enforcement and although, his decision to break the glass door shows the opposite of that in the

---

[2]   Mr. Jennings' arrest was reported by several of his local news publications as well as other nationwide news services:

https://www.manchestertimes.com/news/local/hillsboro-man-arrested-on-charges-for-jan-6-capitol-breach/article_a2e0696e-53f2-11ee-889e-5f32d5a1981f.html

https://www.tullahomanews.com/news/local/coffee-county-man-arrested-for-storming-capitol/article_45b6e818-53fb-11ee-87e8-3f728e0198ea.html

https://www.wkrn.com/news/local-news/coffee-county-man-arrested-for-alleged-role-during-jan-6-riots/

https://fox17.com/news/local/coffee-county-man-arrested-on-for-actions-during-jan-6-capitol-breach-hillsboro-tennessee

https://www.wusa9.com/article/news/national/capitol-riots/tennessee-man-pleads-guilty-to-smashing-glass-door-in-capitol-tunnel-on-jan-6-allan-jennings-riot/65-4f32888c-2f6a-41a2-927a-8f76edab1524

moment, Mr. Jennings knows that this is a serious offense. He will abide by this Court's sentencing decision and follow any and all conditions of probation, home detention and supervised release to further demonstrate his respect for the law.

Regarding whether Mr. Jennings should be incarcerated for this conduct, Mr. Jennings' personal history and characteristics outweigh any interest in incarceration. It is highly unlikely that Mr. Jennings will ever violate the law again.

Mr. Jennings submits that his felony conviction followed by an extended period of supervision and restrictions on his personal freedoms that subject him to imprisonment if violated provides just punishment in this case. As the U.S. Supreme Court noted in *Gall*, offenders on probation are subject to "conditions that substantially restrict their liberty," *Gall* notes:

> Probationers may not leave the judicial district, move or change jobs without notifying, and in some cases receiving permission from their probation officers or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any persons convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual, "special conditions" imposed by the court…Probation, if violated, may result in any…sentence that initially could have been imposed. *Gall*, 552 U.S. at 48-49.

These conditions serve multiple purposes which include promoting respect for the law and also punishing the Defendant for his actions.

### D.   <u>Need For the Sentence to Afford Adequate Deterrence</u>

While specific deterrence looks to dissuade an individual defendant from committing future crimes, general deterrence aims to have the same effect on "the population at large." *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010).

Mr. Jennings has no criminal history whatsoever. He is a very low, if any risk, to re-offend. There is no need to protect the public from future crimes of Mr. Jennings. Further, there is no need for vocational training, medical care or other correctional treatment.

There are multiple ways in which Mr. Jennings has been punished.  First, Mr. Jenning was located by law enforcement, questioned, publicly charged and now faces a public sentencing.  The public spectacle of these January 6 cases carry with it tremendous humiliation in the community in which he lives and worked.  After he was charged, he resigned from his position as a nurse with the Coffee County Sheriff's Department and had to tell his supervisors about the charges and his conduct.  These were men who respected Mr. Jennings and vice versa.

Second, he will be a convicted felon.

Third, he most likely will lose his coveted nursing license.[3]   He will be a 57 year old former nurse likely without a nursing license.  He most likely will be unable to do the job that he has performed for over thirty (30) years.

Fourth, he has made full payment of restitution in this case prior to sentencing.

Fifth, Mr. Jennings is subject to the standard conditions of probation which the United States Supreme Court in *Gall* acknowledged that "[o]ffenders on probation are ... subject to several standard conditions *that substantially restrict their liberty*."  *Gall v. United States,* 552 U.S. 38, 48, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007).

---

[3]  T.C.A. § 63-7-115(a)(1) states that the Nursing Board "has the power to deny, revoke, or suspect any certificate or license to practice nursing or to otherwise discipline a licensee upon proof that the person: (B) Is guilty of a crime.  *See Also*, *Miller v. Tennessee Board of Nursing*, 256 S.W.3d 225 (Tenn.Ct.App. 2007)(nurse's guilty pleas to vandalism and resisting arrest supported Board's decision that nurse was guilty of a crime.)  Rule 1000-01-.13(5) of the *Rules of the Tennessee Board of Nursing*, Chapter 1000-01, provides, "The Board considers any criminal conviction, whether or not listed in Rule 1000-01-.13(2) above, to be a violation of T.C.A. § 63-7-115(a)(1)(B). If an applicant or a registered nurse already licensed by the Board is convicted of any crime, it is grounds for denial of licensure or disciplinary action by the Board."

Sixth, Mr. Jennings is seeking a probationary sentence and/or a sentence including home confinement.  Restricting Mr. Jennings' liberty to only his house for an extended period of time also constitutes punishment.

Seventh, Mr. Jennings is less culpable than some of the other January 6 Defendants.  He never entered the U.S. Capitol and was not charged with any trespass.  He did not assault any officer or cross any police barricade.  He was unarmed.  He was not directing or leading the crowd and there is no evidence that he said anything to encourage the crowd.  Rather, he told friends immediately after January 6 that he was telling the crowd to not hurt law enforcement.  And, after breaking the glass door, he left the area of the Tunnel within minutes fighting to get through the pushing crowd.  Lastly, after January 6, there is no evidence that Jennings bragged or boasted about his conduct online or to any media outlets.

Regarding general deterrence, as of September 6, 2024, there have been 965 Defendants sentenced for a capitol breach case and 141 received periods of incarceration where they were allowed to serve the entirety of their sentence on home detention.[4]  Mr. Jennings submits that general deterrence is met with a sentence of probation and/or home detention for 6-12 months, followed by supervised released and requirement to attend community service meet these deterrence factors under §3553(a).

### E.     Need to Protect the Public & Provide the Defendant with Needed Correctional Treatment.

Respectfully, based upon Mr. Jennings lack of any criminal history and his work experience, these factors weigh in favor of a probated sentence or a sentence of home confinement.

---

[4]  https://www.justice.gov/usao-dc/44-months-jan-6-attack-us-capitol

F.      **Kinds of Sentences Available**

The PSR has recommended a guideline range that is within Zone B of the Sentencing Guidelines.   Zone B allows for a sentence of probation and/or home confinement for this Defendant.   Therefore, this Court is justified in sentencing the Defendant to probation and/or home confinement under the Guidelines presently (even if the Court denied his Variance motion). Should this Court grant Mr. Jennings' Motion for a Variance downward, the Defendant submits that a sentence of probation and/or home confinement is even more warranted.

G.      **Need to Avoid Unwarranted Sentencing Disparities**

As indicated above, over a hundred and forty (140) capitol breach Defendants have been sentenced to probationary terms which included periods of home detention.  Mr. Jennings' case is bit unique in that he did not enter the U.S. Capitol, nor did he assault any law enforcement officer. He did damage property and make law enforcement's job on January 6, 2021 even more difficult by doing so.

Mr. Jennings submits the following cases below to show that a sentence of probation and/or home confinement for him would not lead any sentencing disparity as his case is similar to the following:

*U.S. v. Nicholas Rodean*, Docket No. 1:21-CR-57.   The Defendant was found guilty following a trial of felony destruction of government property and six (6) misdemeanor offenses. Sentenced to sixty (60) months of probation including 240 days of home detention and ordered to pay $2,048 in restitution.   Rodean entered the Capitol building with a Trump hat and walked through the halls of Congress carrying a large red flag which stated, "Trump is my President." Rodean, who apparently had a form of Asperger's syndrome, shattered two (2) Capitol windows with a flagpole.

*U.S. v. Dylan Bowling*, Docket No. 1:23-CR-425.   Defendant (and his wife) carried respirators and a bull horn to the Capitol and entered through a broken window.   He spent approximately 21 minutes inside the Capitol and he initially lied to the FBI about whether he entered the Capitol.   He was sentenced to 24 months of probation with the first 30 days on home detention, and 60 hours of community service.

*U.S. v. James Breheny*, Docket No. 1:23-CR-179.   Bergen County, NJ Coordinator of the Oath Keepers (no longer a member) who joined the mob outside of the East Rotunda Doors that forced entry into the Capitol.   He agreed to cooperate against other Oath Keepers.   He was sentenced to thirty-six (36) months of probation with the first six (6) months on home detention, 120 hours of community service and $2,000 in restitution.

*U.S. v. Michael Aaron Carico*, Docket No. 1:21-CR-696.   Defendant climbed the media tower and yelled, "Hey Nancy, go f—k yourself" and then entered the Capitol and spent 52 minutes inside.   Defendant was sentenced to twenty-four (24) months of probation with the first sixty (60) days of home detention, $500 restitution, $500 fine and 60 hours of community service.

*U.S. v. Karol Chwiesiuk*, Docket No. 1:21-CR-536.   Defendant texted friends on his way to D.C. that he was "busy planning how to f—k up commies." He entered the Capitol and went to Senator Jeff Merkley's office with others, allegedly at the same time as two rioters were smoking cigars.   He sent a picture while inside the Capitol to a friend saying, "inside the capital [sic] lmfao." He then exited through a broken window.   Defendant was sentenced to three (3) years of probation with the first ninety (90) days on home detention, 200 hours of community service and $500 restitution.

*U.S. v. William Isaacs*, Docket No. 1:21-CR-28.   Defendant was part of a group of Oath Keepers who donned paramilitary  gear and clothing and marched with eight (8) other members to

the inside of the Capitol with the intent to stop the vote count.  Isaacs joined hands with eight (8) other members and moved in a coordinated and calculated fashion up the steps of the Capitol in a military stack formation.  He joined rioters who were trying to push their way through a police line.  The police had to deploy chemical spray to hold them back.  Defendant convicted after a trial.  Defendant sentenced to sixty (60) months probation with the first eighteen (18) months on home detention and 500 hours of community service.

*U.S. v. Sandra Parker*, Docket NO. 1:21-CR-28.   Defendant was part of the same group with Defendant Issaacs described above.  Defendant sentenced to sixty (60) months probation with the first twelve (12) months on home detention and 250 hours of community service.

### H.     Aberrant Behavior pursuant to U.S.S.G. §5K2.20

U.S.S.G. §5K2.20 provides that a downward departure may be warranted in an exceptional case if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life.  Further, the prohibitions contained in subsection (c) do not apply because the offense did not involve serious bodily injury or death, the defendant did not discharge or use a firearm, this is not a serious drug trafficking crime and the Defendant has zero (0) criminal history points.

Application Note 3 to U.S.S.G. §5K2.20 provides that in determining whether a departure is warranted under this section, the court should consider the defendant's mental and emotional conditions, employment record, record of prior good works, motivation for committing the offense and efforts to mitigate the effects of the offense.

In the present case, President Trump threw gasoline on a fire by telling his supporters that the election was stolen.  Trump's comments and actions had an impact on Mr. Jennings.  He did

not plan to break any door that day and his decision to use a glass breaking tool on his pair of scissors was relatively quick and represents a significant deviation from the rest of his life.  Mr. Jennings has zero (0) criminal history points, has a stellar employment record, and has demonstrated a history of good works.

Respectfully, Mr. Jennings' criminal conduct did not cause or involve serious bodily injury or death, and within minutes, he began leaving the area by pushing back through the crowd instead of trespassing into the Capitol.  The Defendant submits that a downward departure is warranted in these circumstances.

### III.    Character Letters

Attached hereto as Exhibit "A" are nine (9) character letters from Mr. Jennings' family, friends, and colleagues. Excerpts from the letters are as follows:

**Chad Partin, Coffee County, TN Sheriff**: *"Allan is a self-made individual. He served in the US Army honorably, came home, went to work, and began to put himself through college. Allan became a nurse and of all the places he could have worked he ended up working in the prison system in California. After 25 years of decorated service, he retired and came to Tennessee. My department was very fortunate that he got bored with retirement and decided to work in our department. Allan was very active at work and off work. He has been part of our community as a volunteer helping others… I speak for thousands of citizens from Coffee County, TN to please have compassion in the case of Allan Jennings."*

**Frank C. Watkins, Coffee County, TN Chief Deputy**: *"Being the Chief Deputy, I interacted with Allan daily. Allan has a lot of compassion for his fellow man and would do anything for anyone who needs help. This was shown in his work at the jail with not only the inmates under his care but also those who worked with and around Allan. I learned a lot about Allan and his prior service to not only other states and counties but our country. Allan served in the Army as an infantryman, a supervisor in construction, and became the Assistant Statewide Chief Nurse Executive in California."*

**Julia Logan-Mayes, Volunteer Coordinator at Compassus Hospice & Palliative Care:** *"Allan was eager, and we discussed that we not only had one patient but two Veteran patients in his area and he was delighted and wanted to be assigned to both. Allan has been visiting these patients since November 2023 each twice a month to provide companion and emotional support… Allan is a very kind and compassionate man and has developed such nice companion relationships with these Veterans during their final chapter of life.*

*Recently, I was asked to speak to a local Veterans group and asked Allan to accompany me to speak to the Veterans on his perspective of Vet-to-Vet volunteering and the importance of it. He did and spoke authentically to this group of approximately 30 Veterans. I have nothing but respect for Allan."*

**Lieutenant Daniel Ray, Coffee County Sheriff's Office**: *"I have worked with Mr. Jennings for approximately 5 years. Throughout these years, he has become one of my closest friends and trusted co-workers. I supervised Mr. Jennings on our SWAT team at this agency. Mr. Jennings was one of our medics assigned to our perimeter team. He was always professional and was one of the hardest workers I have ever served with. He was always willing to volunteer his time to assist with teaching stop the bleed at my department in service. My agency received amazing training from Mr. Jennings. Mr. Jennings is also one of my closest friends. He is always my ear and shoulder when I would need someone to lean on. He is one of the most kindhearted people I have ever had the pleasure to be around. He has helped me through quite a bit of personal problems. The other deputies at this agency always enjoy being around Allen. He always has a smile on his face and ready to help anyone that needs it. Allan is not just a SWAT medic or a coworker, he is one of my best friends."*

**Stacey Jennings, Allan's Wife:** *"My husband has always worked hard for our family and has been a source of support financially and emotionally. When we made the move from California to Tennessee my parents moved with us and live right down the street. As they get older it is comforting to have them so close. Allan is so helpful to them when they need anything at all. His parents have sadly passed but he is so wonderful with my parents. Allan has a kind heart and helpful nature. He is always willing to help his family, friends, and neighbors. He is involved in several volunteer programs such as the American Red Cross, Compassus Hospice and Samaritan's Purse. We donate and bring food to help at our local Good Samaritans and we visit with Hospice patients together. I have seen firsthand his kind and friendly nature with them... We all love him and will support him through this. After all these years of marriage he is still the person that has a shoulder to cry on and the person who makes me laugh when I truly need it. The person that holds our dog during thunderstorms and makes her feel safe. He is my comfort and happiness, and I will always love him for that."*

**Brody Jennings, Allan's Son:** *"He's a humble man who would say he wasn't a perfect father or always a good man, but you can rest assured that is a fabrication of his own mind, because aside from being a great father, he's also a hero. As genuine a hero as someone can be in this day and age. Allan has not only volunteered to help with several different hurricane relief efforts over the years he's lived in Tennessee, but he also spent a decade donating blood, until they literally wouldn't allow him to anymore. He served his country with honorable discharge. This is the man who stops traffic to move turtles out of the road, who will always help any neighbor in need, even the ones he doesn't like. Once, when driving in the dead of night to take his family to Disneyland, he saw a lonely car on fire off the freeway and jumped out of the car, ran into the burning vehicle, and pulled out the driver, and wrapped him in my childhood blanket and waited for the paramedics to arrive. Who does that? Someone I can call a hero."*

**Jack and Judy Fetzer, Allan's In-laws:** *"He has been more than a wonderful son-in-law to us, he has been a good friend. Always there for us whenever we need his help for anything... He has been a wonderful husband and provider to our daughter and their children and our grandchildren. In conclusion: Our love for Allan is genuine and our respect and friendship with Allan is strong."*

**Michael Compton, Allan's Neighbor:** *"Allan has become the man I trust with my children if there is an emergency, and I am not home. Our first month being neighbors our family dog had gotten loose from our backyard while my family was out for the morning. Allan and his wife spent several hours not only finding our dog but repairing our fence to make sure our family pet didn't escape again. I wish I had saved the video footage of Allan opening his car door, our dog jumping out and running away from him. He patiently got back in his car, tracked her down again, got our dog back into the yard and pieced our vinyl fence back together. You couldn't help but laugh at the situation that unfolded on the video. But what everyone misses from that story is Allan's patience and kindness shown to our family and dog when he didn't even know us... Allan is a friend that I cherish. He has not only modeled what it means to be a good neighbor and friend, he has given me great advice about being a father and how I can avoid mistakes he's made raising his own children. Most men do not have the humility to admit their mistakes and be willing to share them with another man. Allan has given me great guidance during our talks and displayed by his actions."*

**American Red Cross, Tennessee Region from Nancy Pace, Sr. Volunteer Engagement Specialist:** *"Allan Jennings started volunteering wit the American Red Cross on 10/18/23. He is a stellar volunteer and currently holds a multitude of positions on our Disaster Cycle Services Team."* Those include positions include *"Disaster Action Team Member", "Disaster Action Team Service Associate", "Individual Disaster Care Health Services Team Member", and "Blood Donor Ambassador."* He has volunteered 576 hours on-call, and another 106.72 hours. Mrs. Pace writes, *"The American Red Cross is proud to stand beside him in service to others. His service makes a difference in the lives of people in our communities facing their worst days due to fires, tornadoes, flooding and any disaster emergency where there is a need."*

## IV.      <u>Conclusion</u>

The Defendant respectfully requests that this Court sentence him to probation and/or home confinement for 6-12 months, supervised release of 1 year and community service.

Respectfully submitted,

**DAVIS & HOSS P.C.**

/s/ Bryan Hoss_____
Bryan Hoss, TN BPR# 021529
850 Fort Wood Street
Chattanooga, TN 37402
423-266-0605
423-266-0687—Fax
bryan@davis-hoss.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Motion was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

This the 24th day of September 2024.

/s/ Bryan Hoss_____